ADDISON WEBSTER *vs*. THE TOWN OF HARWINTON.

The towns of this state have no original power of legislation and taxation in aid of the general government in times of public peril.

They have no original or inherent power whatever. All their powers are either expressly granted by the legislative power of the state or are such as are necessary to the performance of their duties as territorial and municipal corporations.

The towns of Hartford, Wethersfield and Windsor, which originally constituted the Colony of Connecticut, were not corporations, in the proper sense of that term, previous to the constitution of 1639. They were first made corporations by the act of the General Court, under that constitution, passed in October, 1639.

The history of legislation with regard to towns reviewed.

Where the money of a town is illegally appropriated by a vote of the town, an injunction will lie. The legal remedy, by a suit to recover back the tax paid, is not adequate.

PETITION for an injunction.

The petition alleged that the petitioner was the owner of property, real and personal, and liable to the payment of taxes in the town of Harwinton; that at a special meeting of the town, held on the 22d of August, 1863, for the purpose of appropriating money from the treasury of the town, to aid such persons as might be drafted from the town by authority of the United States, under an act of Congress approved March 3d, 1863, entitled "an act for enrolling and calling out the national forces and for other purposes," it was voted by the town as follows:—
"To pay each drafted man from said town under said act, and pursuant to the call of the President of the United States for the raising of three hundred thousand men, the sum of three hundred dollars, who should himself go to the war, or such sum not exceeding three hundred dollars as such drafted man may actually have to pay for furnishing a substitute, the same not to be paid until such drafted man or substitute is accepted and sworn into the service of the United States;" that it was further voted to instruct the selectmen to borrow on the credit of the town the sum needed to pay the drafted men or substitutes, whenever they should ascertain the sum needed; that the votes were passed in opposition to the views and wishes of the petitioner and many other tax-

payers of said town ; that six persons had already been drafted from the town and held to service under the law of Congress, who had all procured substitutes at an expense of more than three hundred dollars each, and that more persons would be required from the town to fill up its quota ; and that the petitioner was informed and believed that the selectmen had not as yet obtained the money required by borrowing, but that they were endeavoring to obtain the money, and that he believed that·they would proceed to pay the money if it could be obtained, and if not, would draw orders on the treasurer in favor of all drafted men accepted into the service of the United States or who should procure substitutes. The petition then set forth the injury that would result to the petitioner as a tax-payer, and prayed for an injunction against the payment of the money under the votes of the town.

The respondents demurred to the petition. The superior court ( *Sanford, J.,* ) overruled the demurrer and granted the injunction, and the respondents brought the record before this court for revision by motion in error.

*Andrews*, for the plaintiffs in error, commenced his argument by remarking, that during the summer and fall of 1863 more than one hundred and twenty towns in this state passed votes for the same general purpose as those set out in the petitioner's bill. In nearly all the orders have been given and the money paid. In some cases the money has been borrowed of savings banks, in others the orders have been purchased by people of small means, being regarded as a safe and permanent investment. All these orders are holden by our own citizens, and should they be adjudged illegal and void very great distress must ensue and a general distrust of town securities follow which many years can not allay.

That the present war, unlike any other in which our country has been engaged, has appealed to every part of the land ; it has made its demand at every door for the hardiest and healthiest member of the family ; the rich and the poor alike have been summoned to answer its calls for men ; its armies still lack recruits that can only be supplied from the most

able-bodied. It would seem that any course which can relieve this constant demand on the producing population ought to receive the sanction of courts and should be sustained unless there be some imperative rule of law to prevent.

That the objection to these votes on the ground of a want of power in the towns applies equally to all votes giving bounties, whether the recipient be a drafted man or a volunteer. If the town of Harwinton can vote a bounty to $A$ who enters the army without reference to a draft, and can lawfully tax its citizens for that purpose, it can do the same for $B$, who enters the army because of a draft. The difference is in the motive which induces the man to become a soldier and not in the power of the town.

He then contended; 1. That as in a democratic govern ment ultimate sovereignty resides with the people, the simplest municipal organization, viz., the towns, being the most purely democratic and voluntary, possess all power with which they have not expressly parted.

If a number of persons should go beyond the recognized territory of any government and there form a community, it will be readily admitted that such community would possess all the political powers which it is possible for any state or nation to have, being founded on the expressed assent of the whole, and would be sovereign and independent. If other similar communities should be formed in contiguous territory they also would possess all political powers and would be alike sovereign and independent. If now these separate communities should unite and form one general government or state, the state so formed would possess such powers only as the several separate municipalities chose to give it. But this is not imagination. It is the history of the colony of Connecticut as it took place from 1632 to 1640. The independent character of the towns in New Haven colony was still more strongly marked. The whole history of Connecticut shows that the power of the state is but the aggregate of the towns, rather than that the authority of the towns is parceled out from the power of the state. Hollister's History of Conn., Vol. 1, 88; 2 id., 147; Weber's Outlines of Universal History, 362;

Stat. Revision of 1821, Preface, p. 8 ; 2 Kent Com., 4th ed., 275, note ; *Hitchcock* v. *Litchfield,* 1 Root, 206 ; Palfrey's History of New England, 2 Vol., 11 ; De Tocqueville Democracy in America, 1 Vol., 40, 67, 69 ; Bancroft's Hist. United States, 2 Vol., 59, 60.

The right to raise money by taxation in times of public peril, for purposes of defense, and in aid of the general government, is among the powers which towns have never given up. *Hitchcock* v. *Litchfield,* supra. Besides, the towns of this state have always exercised the right thus to raise money, and if it is not among their original powers, have obtained it by prescription. [The counsel here read extracts from the town records of a large number of towns, showing that in the revolution most of the towns in this state passed votes of the same nature as those under consideration.] Our present constitution preserves to the towns all the powers which they have ever possessed. Art. 10, sec. 3.

Sound policy would dictate that towns should have this power. It relieves the government by dividing its burdens ; increases its credit to the extent of the bounties which government would otherwise be obliged to pay ; promotes the efficiency of the recruiting service by making the authorities of each town recruiting officers ; strengthens the government by bringing its needs home to every citizen, and warms the patriotism of the people by making each individual feel a present personal demand upon his love of country.

It is the duty of government so to administer affairs that all interests may be protected. Undoubtedly in time of war everything should be made subservient to its success, but great care ought to be exercised that no industry is unduly burdened. Even war itself demands supplies from agriculture, and money from commerce and manufactures, quite as much as men for its armies. The protection of government should be extended alike to these.

One of the towns in this county is largely engaged in manufacturing. The prosperity of the town depends on its continuance and success. But the labor of his skilled workmen is requisite to the manufacturer. The quota of that town at

the late call was a fraction over one-third of the number enrolled. An enforcement of the draft would almost necessarily have closed the factories. By means of a bounty vote the town filled its quota without taking a man from the work-shops. The government received the full number of men for which it called and has left a source of revenue which otherwise it would have lost. The manufacturer retains his skilled labor. The farmer and merchant are benefited by a market near at hand. So all parties gain and nobody loses. Courts should be influenced by a rule of convenience so obvious as this. Broom's Legal Maxims, 139.

2. The petitioner has complete and adequate remedy at law. 1st. A tax illegally exacted may be recovered. *Atwater* v. *Woodbridge*, 6 Conn., 223 ; *Parker* v. *Redfield*, 10 id., 490 ; *Landon* v. *Litchfield*, 11 id., 251. 2d. The exercise of the extraordinary power of the court in granting injunctions ought not to be extended. 2 Story Eq. Jur., § 459, and note ; *Whittlesey* v. *Hartford, Providence & Fishkill R. R. Co.*, 23 Conn., 421 ; *Roath* v. *Driscoll*, 20 id., 533. 3d. An injunction will not lie to prevent the collection of an illegal tax. *Sheldon* v. *Center School District*, 25 Conn., 224 ; *Dodd* v. *City of Hartford*, id., 232 ; *Van Rennselaer* v. *Kidd*, 4 Barb., 17 ; *Livingston* v. *Hollenbeck*, id., 9 ; *Betts* v. *Williamsburgh*, 15 id., 255. Even though a part of the tax be legal. *Stetson* v. *Kempton*, 13 Mass., 272 ; *Libby* v. *Burnham*, 15 id., 144 ; *Gillette* v. *City of Hartford*, 31 Conn., 351.

*Catlin*, for the defendant in error, contended that the town had not the power to appropriate money for bounties to drafted men, and that the towns of the state have no powers not conferred upon them, either expressly or by implication, by the legislature ; citing *City of New London* v. *Brainard*, 22 Conn., 552 ; *Abendroth* v. *Town of Greenwich*, 29 id., 356 ; *Stetson* v. *Kempton*, 13 Mass., 272, and *Hodges* v. *City of Buffalo*, 2 Denio, 110 ; and that an injunction would lie, as the remedy at law, by a suit to recover back the taxes paid, was not adequate ; citing on this point *City of New London* v. *Brainard*, 22 Conn., 557.

BUTLER, J. The argument of the plaintiffs in error on the first point in this case assumes that the towns of this state have inherent powers of legislation and taxation, other than those expressly granted to them or necessary to the performance of their duties as territorial and municipal corporations, and among them the power of legislation and taxation in aid of the national government in times of public peril. The authorities cited are with one exception historians, and certainly the towns have been liberally, and, if regarded as subordinate and auxiliary instrumentalities, deservedly praised by them. Doubtless too, in thus praising them they have said, some of them, that when the constitution of 1639 was framed and adopted by the people of the towns of Hartford, Windsor and Wethersfield, those towns gave up *a part* of their corporate powers as they received them from the free planters, and retained the rest in absolute right. But these views have been expressed by them without sufficient reflection or examination, and are not correct in principle or sustained by our colonial records or by any adjudication of our courts. As the plaintiffs found their motion in error on that claim of reserved power in the towns, and have urged it with apparent confidence, we will briefly examine it.

Corporations aggregate are created by the law of some superior, conferring powers upon the members of an association not otherwise possessed by them, and giving them as associated for certain purposes expressed in their charters, *legal individuality*, so that all can act as one in regard to those purposes, and such action be considered or contemplated in the law of that superior as the action of one artificial being.

The free planters of Hartford, Windsor and Wethersfield had no patent from the king. They emigrated from Massachusetts, which was then an organized commonwealth, and with the consent of that commonwealth, but they received from Massachusetts no corporate powers. They came from three different towns in as many parties, and when they settled themselves down on the banks of the Connecticut, they settled in three different places, and could and did organize themselves and establish *governments* as plantations or towns,

and as one colony, and with a general court or legislature for all, and thus protect themselves, and make and wage offensive and successful war against their hostile Indian neighbors. But the inhabitants of the several plantations and towns obviously could not and did not constitute themselves *corporations* nor were they created such by any superior government, existing or of their own creation, and were not such in any sense of the term which can be recognized by a jurist in determining a question of constitutional law. They and all the other towns of the state, however, are now corporations, and of course have charters. What are those charters and whence derived ?

Clearly they are not derived from any acts of their own previous to the adoption of the constitution of 1639, constituting them corporations, for that could not be, nor from any of the special provisions of that constitution, for there are none such in it. That extraordinary instrument purports on its face to be the work of the people—the residents and inhabitants—the free-planters themselves of the three towns. It recognizes the towns as existing municipalities, but not as corporate or independent, and makes no reservation, expressly or impliedly, of property or of legislative power in their favor. It established a general court or assembly, and authorized the towns to elect and send deputies to compose it, but it prescribed their number and the manner in which they should be elected ; and having thus provided a legislative body it gave that body exclusively *supreme power*, their entire sovereignty and territory not possessed by individuals, in the following comprehensive words—" In which said general courts shall consist the supreme power of the commonwealth, and *they only* shall have power to make laws or repeal them, to grant levies, to admit freemen, dispose of lands undisposed of to several towns or persons, and also shall have power to call either court or magistrate, or any other person whatsoever, into question for any misdemeanor, and may for just cause displace or deal otherwise according to the nature of the offense ; and also may *deal in any other matter that concerns the good of this*

*commonwealth*, except election of magistrates, which shall be done by the whole body of freemen."

The men who thus conferred supreme and exclusive legislative, executive and judicial power, and all power except that of *electing* magistrates, upon the general court, spoke only when they had occasion to speak, and meant all they said; and that entire and exclusive grant would not have left a scintilla of corporate power remaining in themselves, as inhabitants of the towns, if any such had then existed.

That constitution was adopted on the 14th of January, 1639, and at the first regular business session, in October of the same year, the general court exercised the power thus conferred, and "ordered"—(that was the style of their enactments,) that "the towns of Hartford, Windsor and Wethersfield, or any other of the towns within this jurisdiction, shall each of them *have power* to dispose of their own lands undisposed of, and all other commodities arising out of their own limits bounded out by the court, (the liberties of the great river excepted,) as also to choose their own officers, and make such orders as may be for the well-ordering of their own towns, being not repugnant to any law here established, as also to impose penalties for the breach of the same, &c."

That provision was in force till the revision of 1672, when it was re-enacted in the following form:—" The settled and approved inhabitants of every town in this state, qualified and having estate as is hereafter in this act provided, shall have power to make such orders, rules and constitutions as may concern the welfare of their town; provided they be not of a criminal but of a prudential nature, and that their penalties exceed not three dollars and thirty-four cents for one offense, and that they be not repugnant to the laws and orders of this state." Statutes, ed. of 1808, page 649. The last provision remained in force until the revision of 1821, when it was re-enacted in the following form:—" The inhabitants of the respective towns, in legal meeting assembled, shall have power to make such orders, rules and regulations for the welfare of the towns as they may deem expedient, and to enforce them by suitable penalties; provided such regulations do not con-

cern matters of a criminal nature, are not repugnant to the laws of this state, and the penalties do not exceed four dollars for one breach." Revision of 1821, page 415. And in that form it is still in force. Rev. Stat., tit. 3, sec. 29; Compilation of 1854, page 163.

Now that provision enacted by the general court in 1639, was both a grant and a limitation of vital power, and was intended to embrace towns thereafter created (as they were in fact) by law, and is utterly inconsistent with the idea of a reserved sovereignty, or of any absolute right in the towns, and constituted the towns corporations, and the continuance of it has continued them so; and that provision, with the numerous special provisions then and since made, prescribing their officers, and regulating their meetings and other proceedings, and imposing and prescribing their duties as subordinate municipal corporations, constitute their charters; and thus their powers, instead of being inherent or reserved, have been delegated and controlled by the supreme legislative power of the state from its earliest organization.

And such is the law as uniformly recognized in this court. *Hayden* v. *Noyes*, 5 Conn., 391; *Willard* v. *Borough of Killingworth*, 8 id., 254; *Higley* v. *Bunce*, 10 id., 442; *New London* v. *Brainard*, 22 id., 552; *Abendroth* v. *Greenwich*, 29 id., 356; *Booth* v. *Woodbury*, ante p. 118.

The case of *Hitchcock* v. *Litchfield*, (1 Root, 206,) the only case cited and relied upon by the plaintiff in error, is not in point. At that time troops were raised by the state, and by an assignment of quotas to the towns. By public law which was both authoritative and mandatory, it was made the duty of each town to raise its allotted quota; and a soldier who had been enlisted by the town of Litchfield to fill its quota, and served accordingly, sued for the bounty offered by the town. One of the defences was a want of consideration, but the court held the public service, and the performance of it by the enlisted man, a sufficient consideration. We find no recognition of the doctrine that the town acted by virtue of any inherent or reserved power of legislation in that case, and know of no decided case, nor of any page of the colonial or

other records of the state, in which the existence of such a power has ever been recognized.

The second assignment of error is equally without foundation. That the remedy at law in such a case is not or may not be fully adequate, and an injunction may properly issue, was settled in this court in the case of *New London* v. *Brainard*, 22 Conn., 552.

There is no error in the record.

In this opinion the other judges concurred.